**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

CLYDE EARNEST DOUGLAS,        *
                                    *
      Plaintiff,           *
                                      *
vs.                            *   CIVIL ACTION NO. 22-00079-CG-B
                                      *
DEPUTY KYLE FALDOSKI,         *
                                      *
      Defendant.           *

## REPORT AND RECOMMENDATION

Plaintiff Clyde Earnest Douglas, who is not represented by an attorney, filed a complaint under 42 U.S.C. § 1983. (Doc. 20). This case was referred to the undersigned Magistrate Judge for appropriate action pursuant to 28 U.S.C. § 636(b)(1)(B) and S.D. Ala. GenLR 72(a)(2)(R), and it is now before the Court on Defendant Deputy Kyle Faldoski's motion for summary judgment (Doc. 48).[1]  For the reasons discussed herein, it is **RECOMMENDED** that the motion be **GRANTED**, that summary judgment be entered in favor of Defendant Faldoski, that Plaintiff's claims against Defendant Faldoski be **DISMISSED with prejudice,** and that Plaintiff's action be **DISMISSED** in its entirety.

---

[1] The Court converted Defendant Faldoski's answer, special report, and evidentiary material (Docs. 23, 24) into a motion for summary judgment.  (Doc. 48).

I.    <u>BACKGROUND AND FACTUAL ALLEGATIONS</u>[2]

Plaintiff Clyde Earnest Douglas ("Douglas") is suing Baldwin County Sheriff's Deputy Kyle Faldoski ("Deputy Faldoski") for his conduct in effecting an arrest on December 30, 2021. Douglas alleges that Deputy Faldoski was negligent and used excessive force when he tased Douglas four times and broke his right arm while he was not resisting arrest.[3] (Doc. 20 at 5).

According to Douglas, Deputy Faldoski pulled him over for failing to use a turn signal, which Douglas vehemently insists he did use. (<u>Id.</u> at 4). Once pulled over, Deputy Faldoski ordered Douglas to exit his vehicle, which Douglas refused to do because, as he states:

---

[2] The "'facts', as accepted at the summary judgment stage of the proceedings, may not be the 'actual' facts of the case." <u>Priester v. City of Riviera Beach, Fla.</u>, 208 F.3d 919, 925 n.3 (11th Cir. 2000).

[3] Douglas also sued Quality Correctional Health Care, the healthcare provider for the Baldwin County Sheriff's Corrections Center; South Baldwin Regional Medical Center, the local hospital where he was taken for treatment after his arrest; the Baldwin County Sheriff's Office; and the Baldwin County Sheriff's Corrections Center, for denied or delayed medical treatment for his injuries suffered incident to the arrest. (<u>See</u> Docs. 1, 11, 20). The Baldwin County Sheriff's Office and the Baldwin County Sheriff's Corrections Center were terminated as defendants in this action on July 5, 2022, when they were not named as defendants in Douglas' first amended complaint. (<u>See</u> Doc. 11). Defendants Quality Correctional Health Care and South Baldwin Regional Medical Center, and the claims against them, were dismissed over Douglas' objection on June 22, 2023, with the Court's adoption of the undersigned's report and recommendation dated April 27, 2023. (<u>See</u> Docs. 36, 39, 40).

> I committed no crime and was within my legal rights to refuse to get out so I decide to run because he was yelling at me he then tazed me a total of 4 times 2 of which were with tazer leads that [Deputy Faldoski] pulled out of me and 2 more times while I was on my stomach [and Deputy Faldoski was] yelling at me stop resisting but I was not resisting [Deputy Faldoski] then yanked my right arm but because it was up against his knee and our combined weight it broke both bones above my wrist which I firmly believe was deliberate because he had to chase me. With his training and size (6'2" 250 lbs) and me (5'11) 150 lbs) I couldn't resist if I wanted to which I did not do I told him something was wrong with my arm but he ignored me yet he called Paramedics because he knew my arm was broke Paramedics arrived on the scene and I was transported to South [B]aldwin Regional Medical Center[.]

(Id. at 4, 8). Douglas is suing Deputy Faldoski for punitive damages in the amount of $250,000.00, and he further requests compensation for his medical bills and that Deputy Faldoski be fired. (Id. at 7).

Faldoski has answered the suit and asserted the defenses of qualified immunity, absolute state immunity, and Eleventh Amendment immunity, and he further contends the force used against Douglas was reasonable under the circumstances and necessary to gain control of a fleeing suspect. (Doc. 24 at 13-14, 22, 29-30). In support of his position, Faldoski has submitted his personal affidavit, which is summarized as follows:

> On December 30, 2021, he was working BASE detail, which included conducting traffic stops. (Doc. 23-5 at 2). After Deputy Faldoski completed a traffic stop, Douglas passed by in his white Ford Ranger pickup truck. (Id. at 3). Deputy Faldoski was "driving behind [Douglas] when he turned into a gas station without using his turn signal." (Id.). Douglas then "immediately pulled out

of the gas station parking lot," so Deputy Faldoski "initiated his blue lights just as Plaintiff was turning into a yard at someone's residence on Highway 98." (Id.). Douglas then continued to drive his truck as if he was going to pull out of the yard. (Id.). Douglas was ordered to stop, and Deputy Faldoski approached the driver's side window of Douglas' vehicle and asked Douglas to exit his vehicle. (Id.). Douglas refused and began to argue with Deputy Faldoski. (Id.). After several orders and warnings to exit, Douglas put his truck in drive and sped off. (Id.). Deputy Faldoski then chased Douglas with his blue lights on, reaching speeds of 100 mph. (Id. at 4). Douglas entered a residential neighborhood, where he continued to drive recklessly before crashing through a fence and wrecking into another fence that stopped his vehicle. (Id.). Douglas climbed out his driver's side window and on top of his truck. (Id.). Deputy Faldoski exited his vehicle and attempted to subdue Douglas by utilizing his issued Taser. (Id.). Douglas was attempting to jump the wooden fence that his truck crashed into at the time the taser was deployed, and Douglas fell over the fence. (Id.). Deputy Faldoski ran to the other side of the fence, where Douglas was starting to run. (Id.). Deputy Faldoski used his taser again to stop Douglas from running. (Id.). Douglas tripped. (Id.). Deputy Faldoski attempted to gain control of Douglas, but he resisted. (Id. at 5). Deputy Faldoski drive-stunned Douglas two more times to gain control of him, as Douglas refused to put his hands behind his back. (Id.). When handcuffing Douglas, Deputy Faldoski noticed his arm was probably broken and called an ambulance to the scene. (Id.). A search incident to arrest revealed 3.5 grams of methamphetamine in Douglas' pocket, for which he was charged. (Id.). Douglas was taken to South Baldwin Emergency Room and treated before being booked into the Baldwin County Jail. (Id.).

In addition to his personal affidavit, Deputy Faldoski has submitted institutional records (Docs. 23-1; 23-2; 23-3; 23-8; 23-9); the incident report (Doc. 23-2 at 26-33); his bodycam video from the traffic stop, chase, and arrest (Doc. 23-6); and his

dashcam video from the traffic stop, chase, and arrest.  (Doc. 23-7).

Douglas filed unsworn objections to Deputy Faldoski's special report, in which he contends, among other things, that summary judgment should not be granted in favor of Deputy Faldoski because "he used excessive force causing injury and . . . had no legal right to conduct a traffic stop in the first place and his dash cam will reveal I did use my signal therefor he is not protected by immunity because he was not within the scope of his duties conducting false traffic stops."  (Doc. 33 at 4; <u>see also</u> Doc. 34 at 5-9).

After review of the pleadings, the Court ordered that Deputy Faldoski's answer, special report, and exhibits (Docs. 23, 24) be treated as a motion for summary judgment.  (Doc. 48).  Though given an opportunity to respond, Douglas has not filed an objection to the motion for summary judgment.  However, the Court will consider Douglas' sworn statements and filings in opposition to summary judgment.

## II.  <u>STANDARD OF REVIEW</u>

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); <u>see also</u> <u>Garczynski v. Bradshaw</u>, 573 F.3d 1158, 1165 (11th Cir. 2009) (per curiam) ("[S]ummary judgment is appropriate even if

'*some* alleged factual dispute' between the parties remains, so long as there is 'no *genuine* issue of *material* fact.'") (emphasis in original) (citation omitted).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing or pointing out to the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Id. at 322-24.

> Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor.

ThyssenKrupp Steel USA, LLC v. United Forming, Inc., 926 F. Supp. 2d 1286, 1290 (S.D. Ala. 2013) (internal citations omitted).

The requirement to view the facts in favor of the nonmoving party extends only to "genuine" disputes over material facts. Garczynski, 573 F.3d at 1165. "A genuine dispute requires more than 'some metaphysical doubt as to the material facts.'" Id. (citations omitted). "A 'mere scintilla' of evidence is insufficient; the non-moving party must produce substantial evidence in order to defeat a motion for summary judgment." Id. (citation omitted). In addition, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995). More importantly, where "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007).

## III. DISCUSSION AND ANALYSIS

### A. Douglas' claims are not barred by 42 U.S.C. § 1997e(a).

Pursuant to the Prison Litigation Reform Act ("PLRA"), inmates must exhaust all administrative remedies, including prison grievance remedies, before filing suit under 42 U.S.C. § 1983. See 42 U.S.C. § 1997e(a). Deputy Faldoski contends that the Baldwin County Sheriff's Corrections Center grievance process

requires inmates to submit an Inmate Request form that is located on the jail kiosk, and if using an Inmate Request form does not resolve the inmate's complaint, the inmate must then complete an Inmate Grievance form on the jail kiosk. (Doc. 24 at 16). Because Douglas failed to submit any such grievance form, Deputy Faldoski asserts Douglas is barred from bringing this suit. (Id.). "[F]ailure to exhaust is an affirmative defense under the PLRA." Varner v. Shepard, 11 F.4th 1252, 1257 (11th Cir. 2021) (quoting Jones v. Bock, 549 U.S. 199, 216 (2007)). In determining whether a complaint should be dismissed for failing to exhaust administrative remedies, courts must take the plaintiff's version of facts as true. Id.

Douglas has responded that the kiosk system at the jail does not allow for grievances or claims to be filed against a deputy of the sheriff's department. (Doc. 33 at 2; Doc. 34 at 10-11). Instead, the jail's kiosk system processes complaints against jail staff only. (Id.). Douglas submits that this is why a family member had to call the sheriff and complain on his behalf. (Id.).

The law is clear that "[a]n inmate need exhaust only such administrative remedies as are 'available.'" Ross v. Blake, 578 U.S. 632, 648 (2016). For a remedy to be "available," it must be "accessible" and "'capable of use' to obtain 'some relief for the action complained of.'" Id. at 642 (quoting Booth v. Churner, 532 U.S. 731, 738 (2001)). As described by Douglas, the administrative

remedy or grievance system at the jail was not available for him to use to voice a complaint regarding Deputy Faldoski. For this reason, Douglas falls within an exception to the statutory exhaustion requirement and is not barred by § 1997e(a) from bringing this suit.

**B. Eleventh Amendment Immunity.**

To the extent Douglas is proceeding against Deputy Faldoski in his official capacity, his claims fail. The Eleventh Amendment, which specifically prohibits suits against "one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State," has long been held to apply "equally to suits against a state brought in federal court by citizens of that state." Harbert Int'l, Inc. v. James, 157 F.3d 1271, 1277 (11th Cir. 1998). "The state need not be formally named as a defendant for the amendment to apply; state officials sued in their official capacity are also protected by the amendment." Id. (citing Kentucky v. Graham, 473 U.S. 159, 166-67 (1985)). This immunity extends to deputy sheriffs, Carr v. City of Florence, Ala., 916 F.2d 1521, 1527 (11th Cir. 1990), and there is no dispute that Deputy Faldoski was employed by the Baldwin County Sheriff's Office as a deputy sheriff at the time of the events alleged in the complaint. See also Parker v. Williams, 862 F.2d 1471, 1476 n.4 (11th Cir. 1989) (holding that a sheriff sued in his official capacity is entitled to Eleventh Amendment immunity because "suits against an official

in his or her official capacity are suits against the entity the individual represents"), <u>overruled on other grounds by</u> <u>Turquitt v.</u> <u>Jefferson County, Ala.</u>, 137 F.3d 1285 (11th Cir. 1998). Accordingly, Deputy Faldoski, in his official capacity, is entitled to summary judgment as a matter of law.

**C. Qualified Immunity.**

Deputy Faldoski has asserted the defense of qualified immunity as to the claims brought against him. "Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" <u>Dalrymple v.</u> <u>Reno</u>, 334 F.3d 991, 994 (11th Cir. 2003) (quoting <u>Hope v. Pelzer</u>, 536 U.S. 730, 739 (2002)). For qualified immunity to apply, Deputy Faldoski bears the burden of first showing that "he was acting within his discretionary authority when the alleged wrongful acts occurred." <u>Richmond v. Badia</u>, 47 F.4th 1172, 1179 (11th Cir. 2022). The burden then shifts to Douglas to show that Deputy Faldoski's conduct violated a clearly established statutory or constitutional right of which a reasonable officer would have known. <u>Belcher v. City of Foley, Ala.</u>, 30 F.3d 1390, 1395 (11th Cir. 1994).

"To determine whether an official was engaged in a discretionary function, [courts] consider whether the acts the

official undertook 'are of a type that fell within the employee's job responsibilities.'" Crosby v. Monroe County, 394 F.3d 1328, 1332 (11th Cir. 2004) (citation omitted). This is a two-step inquiry, which requires asking whether the government employee was (1) "performing a legitimate job-related function" (2) "through means that were within his power to utilize." Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1265 (11th Cir. 2004). In approaching the first step, "the defendant must have been performing a function that, *but for* the alleged constitutional infirmity, would have fallen with[in] his legitimate job description. Id. at 1266 (emphasis in original). Here, the "general nature" of conducting traffic stops is within an officer's discretionary authority. See Duncan v. Bibb Cnty. Sheriff's Dep't, 471 F. Supp. 3d 1243, 1263 (N.D. Ala. 2020) ("In general, an officer conducting a traffic stop is a discretionary act for the purposes of qualified immunity."). This is so even if the act was ultimately "committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances." Harland, 370 F.3d at 1266. Next, it must be determined whether Deputy Faldoski was "executing that job-related function – that is, pursuing his job-related goals – in an authorized manner." Id. Noting that a defendant is not empowered to violate constitutional rights as a part of his official duties, the Eleventh Circuit has maintained

that the examination of the second prong is "on a general level."
Id. at 1267.    That is, putting aside the constitutional claim
asserted, would the defendant's action "undoubtedly be considered
part of [his] duties and legitimate exercises of [his] authority."
Id.   Stated another way, the fact that a defendant may have
performed a job-related function in an unconstitutional manner
does not change that he was fulling a legitimate job-related
function.   Id.

Here, conducting traffic stops and effecting arrests are
within an officer's "arsenal" of powers.   Id.   Thus, the burden
shifts to Douglas to show that Deputy Faldoski is not entitled to
qualified immunity on the claims asserted against him.

**D. Fourth Amendment Claims under 42 U.S.C. § 1983.**

Douglas alleges "Faldoski tazed him four times while he was
on the ground while telling [him] to stop resisting and broke his
right arm (compound fracture) on December 30, 2021 in Foley,
Alabama." (Doc. 20 at 5).   Because the excessive force alleged by
Douglas was born out of a traffic stop and was used in effectuating
an arrest, the claim falls under the protections of the Fourth
Amendment.

The Fourth Amendment protects people against "unreasonable
searches and seizures." U.S. Const. amend. IV.   "A seizure occurs
when, 'in view of all the circumstances surrounding the incident,
a reasonable person would have believed that he was not free to

leave.'" United States v. Puglisi, 723 F.2d 779, 783 (11th Cir. 1984) (quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980)).  A traffic stop constitutes a "seizure" under the Fourth Amendment, as does a full-scale arrest.  Baxter v. Roberts, 54 F.4th 1241, 1256, 1265 (11th Cir. 2022); see also Mapp v. Ohio, 367 U.S. 643, 655 (1961) (stating that Fourth Amendment protections are enforceable against state actors through the Due Process Clause of the Fourteenth Amendment).  And "*all* claims that law enforcement officers have used excessive force - deadly or not - in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard."  Graham v. Connor, 490 U.S. 386, 395 (1989) (emphasis in original).  Thus, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them . . . ."  Id. at 397.  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  Id. at 396 (citing Terry v. Ohio, 392 U.S. 1, 20–22 (1968)).  This reasonableness standard embodies "allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation."  Id. at 397.  Notably, courts "'recognize[] that the right to make an arrest or

investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.'" Baxter, 54 F.4th at 1269 (quoting Graham, 490 U.S. at 396).

After a thorough review of the record, and for reasons that will be explained, the undersigned finds that Douglas' claim of excessive force fails.

**Initial Traffic Stop**

For purposes of the use-of-force analysis, the undersigned credits Douglas' version of the facts, including that he used his turn signal on the night of December 30, 2021. Notably, this fact is not fully observable from the video footage produced by Deputy Faldoski. (See Doc. 23-7). To be certain, the video evidence confirms Douglas used his turn signal when he exited the gas station and when he pulled into the driveway after Deputy Faldoski initiated his blue lights. However, it is indeterminable from the dashcam video whether Douglas used his turn signal when turning into the gas station. (See id.). Regardless, for Fourth Amendment purposes, Douglas was "seized" once Deputy Faldoski pulled his vehicle over.

Once pulled over, it is undisputed that Douglas refused initial orders to stop moving his truck. (See Docs. 23-6; 23-7). It is undisputed that Douglas argued with Deputy Faldoski for approximately three minutes about the use of his turn signal, his right to remain in his vehicle, and harassment by the Baldwin

County Sheriff's Department.  (See Doc. 23-6).  It is undisputed
that Douglas refused orders to exit his vehicle.  (See id.).  And
it is undisputed that Douglas fled the scene of the traffic stop.
(See Docs. 23-6; 23-7).  It is this action - Douglas' flight -
that breaks any link between the legality of the initial stop and
Douglas' subsequent arrest - which included the use of force.  See
United States v. Nooks, 446 F.2d 1283, 1288 (5th Cir. 1971)[4]
(stating that illegal flight broke the nexus between the illegal
arrest and the search after apprehension).

### Fleeing the Traffic Stop Created Probable Cause to Arrest

The law is clear: if a defendant's response to lawless police
conduct is itself a new, distinct crime, then the police may
constitutionally arrest the defendant for that crime.  See United
States v. Bailey, 691 F.2d 1009, 1017-18 (11th Cir. 1982)
(concluding "that the police may legally arrest a defendant for a
new, distinct crime, even if the new crime is in response to police
misconduct and causally connected thereto").  Accordingly, Douglas'
flight and car chase is fatal to his claim, as the Court will
explain further in addressing Douglas' arguments.

First, Douglas argues the "fruits doctrine" - that "Faldoski
had no legal grounds to initiate a traffic stop against Plaintiff

---

[4] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.
1981) (en banc), the Eleventh Circuit adopted as binding precedent
the decisions of the former Fifth Circuit handed down prior to the
close of business on September 30, 1981.

in the first place, moreover all events that unfolded as a result are a product of forbidden fruit obtained only after forcefully gaining access to Plaintiff, Plaintiff's person, or Plaintiff's vehicle." (Doc. 34 at 6). The "fruit of the poisonous tree" doctrine pertains to evidence seized during a search of a person after an illegal arrest. Brown v. Illinois, 422 U.S. 590, 599 (1975). Based on the doctrine, the seized evidence "will be suppressed as the tainted product of the unlawful police action, unless the prosecution carries its burden of showing that the taint has been purged." Bailey, 691 F.2d at 1013 (citing Brown, 422 U.S. at 600-04). The fruits doctrine requires examination of the causal connection between the lawless police conduct and the seized evidence, and a causal connection "is not established merely because 'but for' the illegal police conduct the defendant would not have responded as he did." Id. (citing Dunaway v. New York, 422 U.S. 200, 217 (1979)). Importantly, and pertinent here, an exception to the exclusionary rule of the fruits doctrine is that an intervening event occurred to break the chain of the unlawful police conduct and the seizure. Id. Such is the current case. When Douglas drove his truck away from the traffic stop, fleeing the scene and instigating a car chase that led to his arrest, he broke the causal connection of the traffic stop and gave separate, probable cause for Deputy Faldoski to arrest him.

Second, to the extent Douglas argues he had a right to flee the scene because the traffic stop was illegal, his argument also fails. While common law historically recognized such a right, id. at 1018 (citing Bad Elk v. United States, 177 U.S. 529 (1900)), the rule "has been greatly eviscerated, if not virtually abolished, in this circuit." Id. (citing United States v. Danehy, 680 F.2d 1311, 1315-16 (11th Cir. 1982) (affirming the district court's refusal to give a jury instruction on the common-law right to resist an unlawful arrest, and stating that "the common-law right to resist an arrest that is not based upon probable cause, suited though it may have been to a past era, has no significant role to play in our society where ready access to the courts is available to redress such police misconduct")).

Accordingly, Douglas' flight was an intervening action that gave Deputy Faldoski independent probable cause to seize him. Probable cause exists if the "facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." Michigan v. DeFillippo, 443 U.S. 31, 37 (1979). In Alabama, it is "unlawful for a person to intentionally flee by any means from anyone the person knows to be a law enforcement officer if the person knows the officer is attempting to arrest the person." Ala. Code § 13A-10-52(a).

"Probable cause 'is not a high bar,'" District of Columbia v. Wesby, 583 U.S. 48, 57 (2018) (quoting Kaley v. United States, 571 U.S. 320, 338 (2014)), and its elements are satisfied here. Consequently, even if the initial traffic stop was unlawful - a question not reached here - Douglas did not have the right to lead Deputy Faldoski on a vehicle chase. Such conduct gave Deputy Faldoski the right to pursue and arrest him. See Bradley v. Benton, 10 F.4th 1232, 1239-40 (11th Cir. 2021) (concluding that it was reasonable for officers to pursue someone who fled a traffic stop). And the right to make an arrest carries with it the right to use some degree of physical coercion or threat thereof to effect it. Graham, 490 U.S. at 396.

**Force Used During Arrest**

The test for determining whether force used during an arrest or investigatory stop is excessive was laid out by the Supreme Court in Graham and "requires careful attention to the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." Id. These factors are analyzed "from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts, and [the court must] balance the risk of bodily harm to the suspect against the gravity of the threat the

18

officer sought to eliminate." McCullough v. Antolini, 559 F.3d 1201, 1206 (11th Cir. 2009). Courts look to the "totality of circumstances" to determine whether the manner of arrest was reasonable. See Tennessee v. Garner, 471 U.S. 1, 8-9 (1985). Here, the Graham factors ultimately weigh in favor of Deputy Faldoski.

As to the severity of the crime at issue, the Court starts at the beginning – the traffic stop. Failure to use a turn signal cannot be viewed as a serious crime. Next, Douglas refused orders to exit his vehicle, and Deputy Faldoski threatened him with arrest and charges of obstruction of government operations. Neither may this crime be viewed as serious. See Stryker v. City of Homewood, 978 F.3d 769, 774 (11th Cir. 2020) ("Nevertheless, the underlying crime — a misdemeanor municipal ordinance violation for failing to comply — cannot fairly be described as 'severe.'"); Reese v. Herbert, 527 F.3d 1253, 1274 (11th Cir. 2008) ("The crime of misdemeanor obstruction is a crime of 'minor severity' for which less force is generally appropriate."). Furthermore, there is no indication that Deputy Faldoski had reason to suspect a crime was afoot or that Douglas was wanted for a serious crime. In this sense, the factor weighs in favor of Douglas. However, the flight from the traffic stop, coupled with Douglas' actions behind the wheel, measurably raise the severity of the crime and threat to safety. It is indisputable from the video evidence that Douglas drove his vehicle beyond the speed limit and drove erratically

through a residential neighborhood at night, including crossing double-yellow lines, running at least one stop sign, driving on the opposite/wrong side of the road, crashing through a fence, and stopping his vehicle only after he wrecked into another fence. (See Doc. 23-7). These facts indicate a threat to the safety of Deputy Faldoski, other drivers on the road, and all persons and property within the neighborhood where Douglas led the chase. Accordingly, the first and second Graham factors shift in favor from Douglas to Deputy Faldoski.

As to the third factor, Douglas' flight from the traffic stop demonstrates he was actively resisting arrest and attempting to evade arrest. The video evidence confirms that Deputy Faldoski warned Douglas that he would be arrested if he failed to exit his vehicle. (See Doc. 23-6). Yet, Douglas insisted that he was not going to exit his vehicle. (Id.). The video clearly reflects an escalation of the encounter as Douglas became more frustrated by Deputy Faldoski's orders and the situation generally, until Douglas fled the traffic stop. (See id.). Thereafter, Douglas attempted to evade arrest until the moment he was physically apprehended by Deputy Faldoski. (See Docs. 23-6, 23-7). Because Douglas claims, and the record supports, that Deputy Faldoski "tased" Douglas four times in effectuating the arrest, the Court will walk through the uses of force separately, as the law is clear that force is reasonable during an arrest where there is resistance,

20

but not after resistance has ceased. See, e.g., Draper v. Reynolds, 369 F.3d 1270, 1278 (11th Cir. 2004) (finding use of taser against "hostile, belligerent, and uncooperative" suspect was reasonable in "difficult, tense and uncertain situation" that likely would have escalated "into a serious physical struggle" where the officer and/or suspect could have been "seriously hurt"); Oliver v. Fiorino, 586 F.3d 898, 905-08 (11th Cir. 2009) (determining initial deployment of taser was reasonable, but repeated deployment constituted excessive force where suspect was no longer resisting).

The video evidence reflects that the car chase ended *only after* Douglas wrecked his truck into a six-foot privacy fence. Even then, Douglas failed to submit to Deputy Faldoski. He did not sit in his truck and wait for Deputy Faldoski to approach him. (See Doc. 23-7). Nor did Douglas exit the truck and submit to handcuffs. (See id.). Instead, Douglas quickly exited his truck through the driver's side window and stood on the hood of his truck, near the fence, appearing as though he intended to jump over the fence, as Deputy Faldoski got out of his patrol car and approached him. (See Docs. 23-6, 23-7). In this hurried and tense situation, Deputy Faldoski (working alone) ran toward Douglas and immediately deployed his taser. (See id.). Under the circumstances, Deputy Faldoski's use of nonlethal force to capture a fleeing suspect was reasonable. See Graham, 490 U.S. at 396-97 ("The calculus of reasonableness must embody allowance for the

fact that police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.").

As the taser deployed, Douglas fell or jumped over the fence,[5] and Deputy Faldoski jumped a shorter fence to gain access to him. (See Doc. 23-7). Neither the taser nor the fall from the fence stopped Douglas, and as he continued to run, Deputy Faldoski again deployed his taser. This active resistance to arrest supports the need for force to subdue and apprehend Douglas. See Cloud v. Stone, 993 F.3d 379, 385 (5th Cir. 2021) ("The record . . . shows that Cloud actively resisted arrest, which gave [the officer] reasonable grounds to tase him."). Deputy Faldoski affirms that his taser made partial contact with Douglas, causing Douglas to trip. (Doc. 23-5 at 4). This is supported by the video evidence, which shows Douglas on the ground.

From here, two things must be mentioned.

First, Douglas specifically claims that he was not resisting while on the ground during these final uses of force; thus, he argues the force was unconstitutional. Cf. Glasscox v. Argo, City of, 903 F.3d 1207, 1220 (11th Cir. 2018) (explaining that an

---

[5] It is unclear from the video evidence and Deputy Faldoski's affidavit whether Douglas was hit with the first taser deployment. (See Doc. 23-5 at 4).

officer violates the Fourth Amendment, and is denied qualified immunity, when he uses gratuitous and excessive force against a suspect who is under control, not resisting, and obeying commands). And, for purposes of this motion, the Court takes as true Douglas' assertion that he was not resisting Deputy Faldoski here but was physically unable to move his arm and comply with the orders given.

Second, the final taser deployments were "drive-stuns," meaning the prongs are removed from the taser gun, such that the weapon will cause pain, but it will not disrupt muscle control. See Hoyt v. Cooks, 672 F.3d 972, 975 n.4 (11th Cir. 2012) ("In the 'drive stun' mode, the weapon is pressed against a person's body and the trigger is pulled resulting in pain (a burning sensation) but the 'drive stun' mode does not disrupt muscle control."). "[T]he use of a Taser in drive-stun mode is generally held to be a preferred and lesser use of force than the potential escalation of physical force and brutality." Thomas v. Demings, 2016 U.S. Dist. LEXIS 78692, at *19, 2016 WL 3356791, at *7 (S.D. Ala. May 2, 2016), report and recommendation adopted, 2016 U.S. Dist. LEXIS 77789, 2016 WL 3351033 (S.D. Ala. June 15, 2016). Consequently, Deputy Faldoski's decision to use his taser in this mode signifies an attempt to use a lesser amount of force to overcome Douglas' resistance and further supports the reasonability of the force used.

As to the final uses of force, the video evidence shows Douglas on the ground (seemingly on his knees) facing Deputy Faldoski.  In a quick exchange, Deputy Faldoski yells, "get down on your face" and Douglas exclaims, "hold up sir, hold up sir", and Deputy Faldoski drive-stuns Douglas.  (Doc. 23-6).  While Douglas' words do not sound aggressive, confrontational, or defiant, he clearly failed to obey Deputy Faldoski's order to lay on the ground with his face down.  At this point, anything other than complete compliance could reasonably be considered resisting arrest.  See Saucier v. Katz, 533 U.S. 194, 205 (2001) ("If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, . . . the officer would be justified in using more force than in fact was needed."), overruled in part on other grounds by Pearson v. Callahan, 555 U.S. 223 (2009).

The last two drive-stuns occurred in quick succession and are not observable on the submitted video footage.  However, the audio from the footage is clear.  Deputy Faldoski gave three repeated orders for Douglas to put his hands out, then he deployed his taser.  Deputy Faldoski then yelled, "Don't move, put your arms out, put your arms out, put your arms out, stop resisting, put your arms out!" and deployed his taser.  (See Doc. 23-6).  Simultaneous with Deputy Faldoski's commands were Douglas' screams and pleas to "stop man."  (Id.).  Douglas then repeatedly articulated that he was not resisting and could not move his arm,

and all force stopped.  (Id.).  Importantly, nothing in the record indicates that Deputy Faldoski knew at the time he deployed his taser that Douglas had a broken arm or was incapable of moving his arm.  Acting under a reasonable, but possibly mistaken, belief that Douglas heard his instructions to put his arms out and chose to not comply, Deputy Faldoski was not required to "wait and hope for the best" before making the split-second decision to tase Douglas.  See Duncan v. Wade, 851 F. App'x 959, 962 (11th Cir. 2021) (per curiam) (quoting Jean-Baptiste v. Gutierrez, 627 F.3d 816, 821 (11th Cir. 2010)); see also Mobley v. Palm Beach Cty. Sheriff Dep't, 783 F.3d 1347, 1355 (11th Cir. 2015) (per curiam) ("Mobley now contends that he posed no threat, but he does not point to any facts that would have made it objectively unreasonable for the officers to believe that he did.").

Based on the record facts, which are observable and undeniable through the video evidence, Deputy Faldoski's use of a taser to effectuate the arrest of Douglas was reasonable and proportional to the threat posed considering the evolution of the situation - a late night traffic stop, with Deputy Faldoski as the lone officer, which progressed to a car chase to apprehend a fleeing suspect in a residential neighborhood.  Because the force used was reasonable under the totality of the circumstance, Douglas has failed to establish a constitutional violation as to Deputy Faldoski's use

of force against him on December 30, 2021. Accordingly, Deputy Faldoski is entitled to qualified immunity.

### E. Absolute Immunity as to State Law Claim.

Douglas has also asserted a state law claim of negligence against Deputy Faldoski. However, the Court lacks jurisdiction over this claim, as it is essentially a claim against the State of Alabama itself.

Article I, § 14 of the Alabama Constitution of 1901 states that "the State of Alabama shall never be made a defendant in any court of law or equity." Ala. Const. 1901, art. I, § 14. This provision provides "the State unwaivable, absolute immunity from suit . . . in any court." Ex parte Town of Lowndesboro, 950 So. 2d 1203, 1206 (Ala. 2006). This immunity from suit extends to executive officers of the State of Alabama, like sheriffs. Hereford v. Jefferson County, 586 So. 2d 209, 210 (Ala. 1991). This includes immunity "from actions against them in their individual capacities for acts they performed in the line and scope of their employment." Ex parte Donaldson, 80 So. 3d 895, 897 (Ala. 2011). Acts are considered "to be within the scope of their employment if the acts are so closely connected with that the servant is employed to do and so fairly and reasonably incidental to it, that they may be regarded as methods, *even though quite improper ones*, of carrying out the objectives of the employment." Shrader v. Employers Mut. Cas. Co., 907 So 2d 1026, 1034 (Ala.

2005) (per curiam) (emphasis in original) (internal quotation marks and citation omitted).  Because deputy sheriffs have been held to be the alter egos of the sheriff, deputy sheriffs enjoy the same immunity from suit.  Alexander v. Hatfield, 652 So. 2d 1142, 1144 (Ala. 1994).

The only exceptions to the immunity afforded to sheriffs and deputy sheriffs are for declaratory and injunctive relief and for monetary damages for claims which arose outside the scope of the officer's employment.  See Wheeler v. George, 39 So. 3d 1061, 1092 (Ala. 2009).  Here, Douglas has requested punitive damages in the amount of $250,000, compensation of all medical bills and future surgeries, and for Deputy Faldoski to be fired.  Douglas' claim for monetary damages due to Deputy Faldoski's alleged negligence is barred by absolute state immunity because Deputy Faldoski was acting within the line and scope of his employment at the time of the incident forming the basis of this action.  As previously discussed, Deputy Faldoski affirms that he was working BASE detail, which included conducting traffic stops and handling the events that unfolded from the traffic stops, including arrests.  (Doc. 23-5).  Deputy Faldoski was thus acting within the line and scope of his employment at the time he stopped, chased, and arrested Douglas.  See Screws v. United States, 325 U.S. 91, 111 (1945) ("Acts of officers who undertake to perform their official duties are included whether they hew to the line of their authority or

overstep it."). Accordingly, he is entitled to absolute state immunity for monetary damages.

Douglas does not seek declaratory relief. And to the extent he seeks for Deputy Faldoski to be fired, this is not the type of injunctive relief that falls within the exception to absolute state immunity. See Parker v. Amerson, 519 So. 2d 442, 443 (Ala. 1987) (noting that the only injunctive relief not barred by Article 1, § 14 is to compel a defendant to perform his duties or to perform ministerial acts, and to enjoin a defendant from enforcing unconstitutional laws or acting in bad faith, fraudulently, beyond his authority, or under mistaken interpretation of the law). Moreover, a federal court does not involve itself in an employee's relationship with his employer. Newman v. Alabama, 559 F.2d 283, 288 (5th Cir.) ("We all understand, of course, that federal courts have no authority to address state officials out of office or to fire state employees or to take over the performance of their functions."), cert. denied, 438 U.S. 915 (1978); Harris v. Whitehead, 2007 WL 2300964, at *1 n.1 (M.D. Ala. Aug. 8, 2007) (noting that the federal court had no authority to discharge prison officials from their positions, as the decision whether to fire them was for their supervisors, not the court). Thus, Douglas' request for the firing of Deputy Faldoski seeks relief that is unavailable in this Court.

Accordingly, Deputy Faldoski is entitled to absolute state immunity regarding the negligence claim asserted against him.

**IV.    CONCLUSION**

Based on the foregoing, the undersigned **RECOMMENDS** that the motion for summary judgment be **GRANTED**, that summary judgment be entered in favor of Deputy Faldoski, that Douglas' claims against Deputy Faldoski be **DISMISSED with prejudice**, and that this action be **DISMISSED** in its entirety.

The instructions that follow contain important information regarding objections to the report and recommendation of the Magistrate Judge.

**NOTICE OF RIGHT TO FILE OBJECTIONS**

A copy of this report and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); S.D. Ala. GenLR 72(c).  The parties should note that under Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period

for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice." 11th Cir. R. 3-1.

In order to be specific, an objection must identify the specific place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

**DONE** this **16th** day of **April, 2024.**

                                    **/s/ SONJA F. BIVINS**
                        **UNITED STATES MAGISTRATE JUDGE**